UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,                                    Criminal No. 11-111 (MJD/FLN)

                        Plaintiff,

            v.                                               **REPORT AND**
                                                             **RECOMMENDATION**
**01- Rosalba Velazquez-Ramos,**
**02- Marlon Cristobal Ramos-Ortiz,**
**03- Jose Hugo Vazquez-Rodriguez,**

                        Defendants.
_____

Thomas M. Hollenhorst, Assistant United States Attorney, for Plaintiff.
E. David Reyes for Defendant Rosalba Velazquez-Ramos.
Kyle D. White for Defendant Marlon Cristobal Ramos-Ortiz.
Stephen W. Walburg for Defendant Jose Hugo Vazquez-Rodriguez.
_____

**THIS MATTER** came before the undersigned United States Magistrate Judge on April 20,

2011 on Defendant Velazquez-Ramos' Pretrial Motion to Suppress Evidence (ECF No. 85);

Defendant Ramos-Ortiz's Motion for Suppression of Statements by Defendant (ECF No. 52); and

Defendant Vazquez-Rodriguez's Motion to Suppress Evidence as a Result of Search and Seizure

and Unlawful Arrest (ECF No. 63).[1] At the hearing, the Government offered testimony from Travis

Hamblen. The Court received four exhibits into evidence.[2] The matter was referred to the

_____

[1] At the April 20, 2011 hearing, the Court also heard Defendant Vazquez-Rodriguez's Motion to Suppress
Statements (ECF No. 62), which was subsequently withdrawn by counsel by letter, dated April 25, 2011 (ECF No.
94).

[2] Government Exhibit 1 is a copy of an "Application and Affidavit for Search Warrant," "Search Warrant,"
and "Return" for an address on O'Henry Road, Brooklyn Center, Minnesota; Government Exhibit 2 is a copy of an
"Application and Affidavit for Search Warrant," "Search Warrant," and "Return" for an apartment unit at an address
on 143rd Street West, Burnsville, Minnesota; Government Exhibit 3 is a copy of an "Application and Affidavit for
Search Warrant," "Search Warrant," and "Return" for an address on 39th Avenue, Columbia Heights, Minnesota;
and Government Exhibit 4 is copy of an "Advisement and Waiver of *Miranda* Rights" card in English and Spanish.

undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For

the reasons set forth below, the Court recommends Defendants' suppression motions be **DENIED**.

## I.   FINDINGS OF FACT

**A.     Search Warrants**

At the hearing, the Government submitted three search warrants for specific addresses on

O'Henry Road in Brooklyn Center, 143rd Street West in Burnsville and 39th Avenue Northeast in

Columbia Heights, Minnesota, respectively. (Gov't Exs. 1-3.)  Homeland Security Investigations

("HSI") Special Agent Travis W. Hamblen, assigned to the Drug Enforcement Administration Task

Force, requested the warrants in this case and served as the affiant for each application. (*See* Gov't

Exs. 1-3.) The affidavits accompanying the applications for all three search warrants are identical

and recite the following events in support of probable cause to search. (*See e.g.* Gov't Ex. 1.)

In August 2010, HSI began investigating Defendants Velazquez-Ramos and Vazquez-

Rodriguez in connection with a drug trafficking organization. (Gov't Ex. 1 ¶ 5.) In September 2010,

a cooperating defendant told Agent Hamblen that he or she had witnessed "at least six drug

transactions at [a specific address on] O'Henry between Velazquez and various others involving

kilogram quantities of cocaine and heroin." (Gov't Ex. 1 ¶ 6.) On October 20, 2010, "a reliable

confidential source ('CS-1') conducted a controlled purchase of approximately eight ounces of

cocaine from Vazquez" at a meet location in Saint Paul. (Gov't Ex. 1 ¶ 7.) Agent Hamblen

determined, through law enforcement surveillance, "public records and the apartment building

manager" that Defendant Vazquez-Rodriguez resides at a specific apartment number at an address

on "143rd Street." (*See* Gov't Ex. 1 ¶ 7.) On October 28, 2010, undercover agents "purchased

approximately four ounces of methamphetamine from Velazquez and Vazquez in Brooklyn Center,

Minnesota." (Gov't Ex. 1 ¶ 8.) Law enforcement observed Defendant Velazquez-Ramos drive directly from the address on O'Henry Road to the drug transaction location and observed her return to the address on O'Henry Road immediately thereafter. (*See* Gov't Ex. 1 ¶ 8.)

On November 16, 2010, undercover agents purchased "approximately one pound of methamphetamine from Velazquez in Brooklyn Center, Minnesota" at which time the agents discussed a potential future purchase of 10 kilograms of cocaine from Defendant Velazquez-Ramos. (*See* Gov't Ex. 1 ¶ 9.) In November and December 2010, "law enforcement learned from two confidential sources that Velasquez [sic] was in the process of purchasing an automotive repair business in Columbia Heights as a 'front' to conduct her drug trafficking activities as well as to store controlled substances." (Gov't Ex. 1 ¶ 10.) On December 9, 2010, "a reliable confidential source ('CS-2') conducted a controlled purchase of two ounces of methamphetamine from Vazquez" in the lobby of Defendant Vazquez-Rodriguez's apartment building on 143rd Street. (Gov't Ex. 1 ¶ 11.) Law enforcement observed the transaction. (Gov't Ex. 1 ¶ 11.)

On December 11, 2010, Brooklyn Center Police officers responded to the address on O'Henry Road and discovered "that Velazquez had overdosed on cocaine." (Gov't Ex. 1 ¶ 12.) On January 24, 2011, "CS-2 conducted a controlled purchase of approximately two ounces of methamphetamine from Vazquez" in the lobby of the apartment building on 143rd Street. (Gov't Ex. 1 ¶ 13.) On February 1, 2011, "a reliable confidential source (CS-3) conducted a controlled purchase of approximately five pounds of marijuana from Vazquez in Saint Paul," during which Defendant Vazquez-Rodriguez "told CS-3 that he kept a supply of cocaine in his apartment in order to supply customers." (Gov't Ex. 1 ¶ 14.) Also on February 1, 2011, law enforcement interviewed Defendant Velazquez-Ramos (in connection with another matter), who stated that she was the owner

3

of an auto repair shop at an address on 39th Avenue and that she lived at a particular address on O'Henry Road.  (Gov't Ex. 1 ¶ 15.)

On February 10, 2011, undercover agents met with Defendant Velazquez-Ramos at her automobile repair business on 39th Avenue "to discuss logistics concerning a 10-kilogram purchase of cocaine." (Gov't Ex. 1 ¶ 16.) During that meeting, Defendant Velazquez-Ramos inquired about the undercover agents' interest in purchasing methamphetamine and provided them "with approximately one gram of methamphetamine as a 'sample' from a desk located in the office of the business." (Gov't Ex. 1 ¶ 16.) Defendant Velazquez-Ramos further told the under cover agents "that she used the shop to conduct drug business." (Gov't Ex. 1 ¶ 16.)

On several occasions over a two-month period prior to the issuance of the warrants, law enforcement noticed "an unusually high number of visitors coming and going from the business" on 39th Avenue during which visitors would "stay for a short time but rarely bring their vehicles into the shop for repairs." (Gov't Ex. 1 ¶ 17.) The affidavit further notes that "[m]any of these visitors have been identified as narcotics traffickers." (Gov't Ex. 1 ¶ 17.)

On February 25, 2011, undercover agents "contacted Velasquez [sic] to make additional plans for the delivery of 10 kilograms of cocaine to her on March 3, 2011, in exchange for $250,000. Velasquez [sic] had previously agreed to supply one-half of the purchase money at the time of the transaction," which was scheduled to occur on March 3, 2011 at a particular hotel in Brooklyn Center. (Gov't Ex. 1 ¶ 18.)

On February 28, 2011, "CS-1 conducted a controlled purchase of approximately nine ounces of cocaine from Vazquez." (Gov't Ex. 1 ¶ 19.) Prior to the transaction, law enforcement observed Defendant Vazquez-Rodriguez leave the above-mentioned address on 143rd Street and drive to the

meet location in Saint Paul, "where he met with CS-1 under police surveillance." (Gov't Ex. 1 ¶ 19.) At that time, Defendant Vazquez-Rodriguez also "agreed to sell CS-1 five kilograms of cocaine on March 2, 2011." (Gov't Ex. 1 ¶ 19.)

The affidavit also states that Defendant Velazquez-Ramos has used a variety of cellular telephone numbers in her encounters with undercover agents and that law enforcement "has recorded numerous incriminating calls over these telephones which include discussions, in coded language, of drug amounts, the price for drugs, meeting places, and other logistics concerning her drug trafficking activities." (Gov't Ex. 1 ¶ 20.)

Based upon the foregoing, Chief United States Magistrate Judge Arthur J. Boylan signed the three search warrant applications and issued search warrants for all three locations on March 1, 2011. (Gov't Exs. 1–3.) The search warrant returns indicate that: multiple cellular phones, documents, and a camera were recovered from the residence on O'Henry Road at 4:15 P.M. on March 3, 2011 (Gov't Ex. 1); two cellular phones, a drug scale, a computer, a television, documents, receipts, and $2000 in currency were recovered from the apartment unit on 143rd Street West at 6:15 P.M. on March 3, 2011 (Gov't Ex. 2); and "3 rocks of suspected methamphetamine, 3 bags of marijuana," two cellular phones, and miscellaneous documents were recovered from the auto repair business on 39th Avenue Northeast (Gov't Ex. 3).

## B.    Testimony of Special Agent Travis Hamblen

Special Agent Travis Hamblen was the case agent assigned to this investigation. At the hearing, he testified regarding the seizure of evidence from a vehicle driven by Defendant Vazquez-Rodriguez as well as the interview of Defendant Ramos-Ortiz.

### 1.    Testimony Regarding Defendant Vazquez-Rodriguez

Agent Hamblen testified that he assisted in the arrest of Defendant Vazquez-Rodriguez on

March 3, 2011 as a result of the above-described investigation. On that date, Burnsville Police

Officers initiated a traffic stop on the Chevrolet truck driven by Defendant Vazquez-Rodriguez in

order to effectuate his arrest.[3] After Defendant was removed from the vehicle and handcuffed, Agent

Hamblen approached the vehicle and observed an open grocery bag "in plain view" on the bench

seat "between the driver and the passenger." Agent Hamblen testified that, visible inside the grocery

bag "that was open at the top and you could clearly see into it" were "either two or three bottles of

Inistol [sic] powder, which is a commonly used cutting agent for diluting cocaine." The bag also

contained a receipt and, "upon looking into it," Agent Hamblen confirmed that "the receipt had Mr.

Vazquez's name on it." Agent Hamblen further testified that the officers conducted "an inventory

search" of the vehicle as it was to be impounded "pending forfeiture proceedings."

###### 2.      Testimony Regarding Defendant Ramos-Ortiz

Although Agent Hamblen did not participate in the interview of Defendant Ramos-Ortiz, he

testified that he was familiar with the facts and circumstances surrounding the statement Defendant

Ramos-Ortiz made to law enforcement on March 3, 2011.[4] On that date, Special Agent Jeremy

Grube, Officer Doug Schmidtke and Community Service Officer Jasmine Sanchez conducted an

interview of Defendant Ramos-Ortiz following his arrest. Special Agent Grube read Defendant

Ramos-Ortiz his *Miranda* rights "from his Department of Homeland Security issued *Miranda* rights

card." (Gov't Ex. 4.) He read the card "line by line" in English, and Ms. Sanchez (a native Spanish

speaker) translated the card into Spanish for Defendant Ramos-Ortiz "on a line by line basis."

Defendant Ramos-Ortiz indicated he understood his rights, waived his rights, and expressed that he

---

[3] Counsel for Defendant Vazquez-Rodriguez represented at the hearing that he does not challenge the existence of probable cause for his arrest.

[4] At the hearing, counsel for Defendant Ramos-Ortiz agreed "to submit the issue" regarding Defendant Ramos-Ortiz's statement "on the testimony" of Agent Hamblen.

wished to make a statement. The interview proceeded with Ms. Sanchez acting as translator. Based on Agent Hamblen's conversations with Agent Grube as to Defendant Ramos-Ortiz's state of mind at the time of the interview, there was no evidence that Defendant Ramos-Ortiz was intoxicated or "in any discomfort" during the interview.

Counsel for the Government represented at the hearing that, while he did make incriminating statements during the interview, the Government does not intend to introduce Defendant Ramos-Ortiz's statements at trial.[5]

## II.    CONCLUSIONS OF LAW

### A.    Search Warrants

#### 1.    Probable Cause Standard for Issuance of Search Warrants

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Under well-established Fourth Amendment jurisprudence, a valid search warrant must be supported by an affidavit providing the signing judge with a substantial basis for determining the existence of probable cause to believe a search would uncover evidence of wrongdoing. *Illinois v. Gates*, 462 U.S. 213, 236-39 (1983).  Probable cause is defined as a "fair probability that contraband or evidence of a crime will be found in a particular place." *See id.* at 238. A supporting affidavit that consists of bare conclusions or conclusory allegations cannot support a finding of probable cause. *Id.*  Veracity, reliability, and basis of knowledge are "highly relevant" in determining whether a supporting affidavit establishes probable cause. *Alabama v. White*, 496 U.S. 325, 328 (1990).

---

[5] At the hearing, Mr. Hollenhorst stated: "Mr. Ramos-Ortiz did, in fact, make incriminating statements . . . . The defense and I do not intend to introduce those statements; I don't think that's an issue in this case."

Still, because "reasonable minds" may differ as to whether a particular affidavit establishes probable cause, the Supreme Court has established a "good faith" exception to the warrant requirement, according great deference to a magistrate's probable cause determination. *See United States v. Leon*, 468 U.S. 897, 914 (1984) (citing *Spinelli v. United States*, 393 U.S. 410, 419 (1969)). The *Leon* Court established that "reliable physical evidence seized by officers reasonably relying on a warrant issued by a detached and neutral magistrate" should be admissible in the prosecution's case in chief. *Leon*, 468 U.S. at 913. On the contrary, if a warrant is based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," the *Leon* good faith exception to the warrant requirement does not apply. *Id.* at 922-23.

Additionally, whether probable cause exists depends on the totality of the circumstances. *See Gates*, 462 U.S. at 238; *United States v. Gabrio*, 295 F.3d 880, 882-83 (8th Cir. 2002). In evaluating the existence of probable cause, courts do not consider each piece of information independently, but instead consider the cumulative meaning of all facts taken together. *See United States v. Allen*, 297 F.3d 790, 794 (8th Cir. 2002).

## 2.    The search warrants were supported by probable cause.

Defendants Velazquez-Ramos and Vazquez-Rodriguez assert that the search warrants in the instant case were issued without probable cause.

The search warrant applications in this case contain a substantial amount of information regarding the investigation, obtained over the course of several months. Specifically, the affidavits describe a number of controlled purchases of significant amounts of methamphetamine and cocaine from Defendants Vazquez-Rodriguez and Velazquez-Ramos by informants as well as undercover agents. The affidavits further describe extensive surveillance conducted at each of the addresses and

confirm the search warrant locations to be the residences of Defendants Vazquez-Rodriguez and Velazquez-Ramos and the business owned by Defendant Velazquez-Ramos. Each of the locations was the subject of surveillance, during which Defendants Vazquez-Rodriguez and Velazquez-Ramos were observed coming and going en route to drug transactions. Additionally, several of the drug buys took place in Defendant Vazquez-Rodriguez's apartment building as well as in Defendant Velazquez-Ramos' auto repair business.

Based upon the totality of the circumstances and considering the cumulative meaning of all facts contained within each search warrant affidavit, the Court finds that there existed a "fair probability that contraband or evidence of a crime" would be found at each of the three locations, such that probable cause existed sufficient for all three warrants to issue.

**B.      Seizure of Inositol From the Vehicle Driven By Defendant Vazquez-Rodriguez**

The Government contends that the Inositol, discovered in the vehicle driven by Defendant Vazquez-Rodriguez at the time of his arrest, is admissible because Agent Hamblen first saw it in plain view. Under the plain view doctrine, a law enforcement officer is permitted to seize evidence without a warrant when: "(1) the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed, (2) the object's incriminating character is immediately apparent, and (3) the officer has a lawful right of access to the object itself." *United States v. Armstrong,* 554 F.3d 1159, 1162-63 (8th Cir. 2009), *cert. denied,* 129 S. Ct. 2805 (2009); *see Horton v. California,* 496 U.S. 128, 136-38 (1990).

Although it is unclear from the testimony whether Agent Hamblen first viewed the grocery bag containing the Inositol while standing outside the vehicle or only after entering the vehicle, Defendant Vazquez-Rodriguez does not appear to dispute that the Government has satisfied the first

and third elements of the plain view doctrine.[6] Defendant argues, however, that the Government has failed to satisfy the second element of the plain view doctrine as the "incriminating character" of the Inositol could not have been "immediately apparent" to Agent Hamblen because the substance is an over-the-counter health supplement with a lawful purpose. (*See* ECF No. 94.) Agent Hamblen testified, however, that, in his experience, Inositol is a commonly used cutting agent for cocaine. Thus, the incriminating nature of the product was apparent to him immediately upon reading the label, which Agent Hamblen testified he was able to do while the substance was still inside the open grocery bag. *See e.g. United States v. Boyd*, 180 F.3d 967, 975 (8th Cir. 1999) (determining that the plain view doctrine applied to render admissible items officer "associated with illegal drug use" including drug scale, currency, and plastic bag of white powder); *Texas v. Brown,* 460 U.S. 730, 740 (1983), quoting *Payton v. New York*, 4445 U.S. 573, 587 (1980) ("The seizure of property in plain view involves no invasion of privacy and is presumptively reasonable assuming that there is probable cause to associate the property with criminal activity.") Therefore, Defendant Vazquez-Rodriguez's argument is without merit.

Even assuming, without deciding, that the plain view doctrine is inapplicable here, the evidence seized would have been inevitably discovered pursuant to a lawful inventory search.[7]

---

[6] Defendant Vazquez-Rodriguez does not appear to dispute that Agent Hamblen had a prior justification under the Fourth Amendment to approach the vehicle based on the existence of probable cause for his arrest. *Texas v. Brown,* 460 U.S. 730, 738, 739 n. 4 (1983) (determining "plain view" provides grounds for seizure of an item when an officer's access to the object has some prior justification under the Fourth Amendment); *United States v. Bynum,* 508 F.3d 1134, 1137 (8th Cir. 2007) ("Neither probable cause nor reasonable suspicion is necessary for an officer to look through a window (or open door) of a vehicle so long as he or she has a right to be in close proximity to the vehicle.") In light of the testimony, the officers appear to have had a "right to be in close proximity to the vehicle" and also had a "lawful right of access" to the Inositol.

[7] Agent Hamblen testified that the vehicle was impounded pending forfeiture proceedings as a result of Defendant Vazquez-Rodriguez's arrest. Thus, the vehicle would have been towed regardless of whether or not Agent Hamblen had first seen the Inositol in the vehicle, and an inventory search would have inevitably been conducted pursuant to standardized procedure. *See United States v. Marshall*, 986 F.2d 1171, 1174 (8th Cir. 1993). Given that officers had probable cause to arrest Defendant Vazquez-Rodriguez at the time of the stop, law enforcement had

Consequently, suppression of the Inositol is not warranted.

## C.     Defendant Ramos-Ortiz's Statements

Defendant Ramos-Ortiz also seeks to suppress the statements he made to law enforcement on March 3, 2011. The Government, however, has represented that it does not intend to offer Defendant Ramos-Ortiz's statements in its case in chief. Defendant Ramos-Ortiz's Motion for Suppression of Statements by Defendant (ECF No. 52) should therefore be denied as moot.

In sum, suppression of evidence is not warranted with respect to Defendants' motions. Thus, the evidence seized pursuant to search warrants executed in this case as well as the Inositol recovered from the vehicle driven by Defendant Vazquez-Rodriguez at the time of his arrest are admissible.

## III.     RECOMMENDATION

Based upon the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.      Defendant Velazquez-Ramos' Pretrial Motion to Suppress Evidence (ECF No. 85) be **DENIED**;

2.      Defendant Ramos-Ortiz's Motion for Suppression of Statements by Defendant (ECF No. 52) be **DENIED as moot**; and

3.      Defendant Vazquez-Rodriguez's Motion to Suppress Evidence as a Result of Search and Seizure and Unlawful Arrest (ECF No. 63) be **DENIED**.

---

actively pursued a "substantial, alternative line of investigation" at the time of any constitutional violation that resulted from any improper search of the passenger compartment of the vehicle at the scene. *See United States v. Thomas*, 524 F.3d 855, 858 (8th Cir. 2008). Therefore, even had the substance not been in plain view at the time of Defendant Vazquez-Rodriguez's arrest, there exists more than "a reasonable probability" that the Inositol would have been discovered by law enforcement "by lawful means." *See id.*

DATED: April 29, 2011                    *s/ Franklin L. Noel*
                                         FRANKLIN L. NOEL
                                         United States Magistrate Judge


Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **May 13, 2011**, written objections that specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within fourteen (14) days after service thereof.  All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **May 13, 2011,** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.